1
2
3
4
5          UNITED STATES DISTRICT COURT
6          SOUTHERN DISTRICT OF CALIFORNIA
7

| | |
|---|---|
| E.M., | Case No.: 19cv689 MJ MSB |
| Plaintiff, | |
| | **ORDER GRANTING IN PART AND DENYING IN PART CROSS MOTIONS FOR SUMMARY JUDGMENT** |
| v. | |
| POWAY UNIFIED SCHOOL DISTRICT, | |
| Defendant. | |

Plaintiff E.M. ("E.M."), by and through his parents ("E.M.'s Parents"), and Defendant Poway Unified School District ("the District"), filed cross motions for summary judgment under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400-09, appealing a decision by Administrative Law Judge Clifford H. Woosley ("the ALJ"). (Doc. Nos. 26, 27.) The motions have been briefed and the court finds them suitable for submission on the papers and without oral argument in accordance with Civil Local Rule 7.1(d)(1). For the below reasons, the court: (1) affirms the ALJ's decision that the District failed to make a sufficiently specific placement offer; (2) declines to reach the issue of whether private school is E.M.'s least restrictive environment; (3) affirms the ALJ's decision that E.M.s' individualized education program (IEP) was reasonably calculated to enable E.M. to make appropriate progress; and (4) affirms the ALJ's decision that the District did not unreasonably delay initiating a due process hearing. The parties' motions are, therefore, **GRANTED IN PART** and **DENIED IN PART**.

## I.   FACTUAL BACKGROUND

E.M. is a ten-year-old boy diagnosed with autism spectrum disorder, attention deficit hyperactivity disorder (ADHD), and anxiety/mood disorder who qualifies for special education services.  (Administrative Record ("AR") at 271.)[1]  E.M. began second grade for the 2016-2017 year in a general education class at Chaparral Elementary.  (*Id.* at 193.)  On September 8, 2016, a required annual meeting was held to review E.M.'s IEP with E.M.'s Parents.  (*Id.* at 321.)  The District offered to keep E.M. in a general education classroom, with some specialized academic instruction, occupational therapy, and speech and language services.  (*Id.* at 341-42.)

On October 6, 2016, E.M.'s Parents were called because he reportedly struck classmates and hit a staff member with a water bottle.  (*Id.* at 729.)  On October 13, 2016, E.M.'s Parents were called because he reportedly hit a school psychologist on the arm multiple times and pounded on his classroom door trying to get in.  (*Id.*)

On October 17, 2016, a meeting was held at E.M.'s Parents' request.  (*Id.* at 348.)  E.M.'s Parents shared their concerns including, *inter alia*, that E.M.'s behavior was interfering with his education, that he was exhibiting behaviors similar to those in kindergarten and first grade, and that being sent to the principal's office was reinforcing his behavior.  (*Id.*)  They also requested that the District develop a behavior intervention plan (BIP) and provide a one-on-one aide to implement the plan and promote E.M.'s safety.  (*Id.*)  The District did not agree to the aide, but agreed to conduct (1) a functional behavior assessment to determine the functions E.M.'s negative behaviors served and how those functions could be more appropriately met, and (2) a special circumstances independence assessment to evaluate the benefit of a one-on-one aide.  (*Id.* at 177, 366.)  On October 20, 2016, E.M. was sent home for reportedly throwing balls at students and hitting a student with a book.  (*Id.* at 728.)

---

[1] References to pages in the administrative record are to the page numbers in the stipulated record, (Doc. No. 25), not those assigned by the court's CM/ECF system.

On October 27, 2016, a meeting was held during which E.M.'s Parents were presented with a draft BIP, but declined to review it "due to parent's desire to have the BIP written by a member of the behavior support team after the completion of [the functional behavior assessment]." (*Id.* at 358.) Due to a "concern for [E.M.'s] safety, and other children's safety," E.M.'s Parents again requested an aide, at least on a temporary basis, until the functional behavior assessment could be completed. (*Id.* at 359.) The District again declined to offer an aide, but agreed to consider it after the completion of the special circumstances independence assessment. (*Id.*) Again, the District offered to keep E.M. in a general education classroom, with some specialized academic instruction, occupational therapy, and speech and language services. (*Id.* at 341-42.) The District also offered an extended school year "based on [E.M.'s] regression and recoupment." (*Id.* at 361.) E.M.'s Parents agreed.[2] (*Id.* at 365.)

On November 9, 2016, E.M. was disciplined with a loss of privileges for causing, attempting, or threating injury. (*Id.* at 728.) The disciplinary report states:

> [E.M.] entered the classroom and started bullying another student by trying to grab his papers and pencils. The other student tried to cover up his items with his arms and [E.M.] proceeded to pry the student's arms open. The student was holding a pencil and it scratched [E.M.] on the arm because [E.M.] was grabbing the student's arms. In return, [E.M.] grabbed the pencil and intentionally scratched the student with it.

(*Id.*)

---

[2] The meeting notes also state:

> A quiet place in the classroom has been made for [E.M.] to access in the gen. ed. [class] and he has chosen to work in the area at times, and at times he works, and is encouraged to work in other areas in the classroom. Father reported that he felt that this was isolation. Site team shared that it appears that is an area that is less distracting for [E.M.]. Parents request an observation of the gen. ed. classroom. [The principal] will coordinate this with the parents for a 30-minute observation.

(AR at 358.)

On December 15, 2016, the District completed the functional behavior assessment, (*id.* at 373-86), and special circumstances independence assessment, (*id.* at 366-72). A meeting was held to discuss the assessments during which it was agreed to develop a BIP. (*Id.* at 387.) Based on the assessment, the District recommended that a one-on-one aide in a general education class would not be sufficient support for E.M. (*Id.*) The parties agreed to discuss the recommendation after a proposed BIP was reviewed. (*Id.*) The parties discussed placing E.M. in a special day class for children with autism spectrum disorder at Westwood Elementary.[3] (*Id.*) E.M.'s Parents wanted to try to implement the BIP in E.M.'s general education class with an aide. (*Id.*) The District agreed to provide "additional classroom support" in E.M.'s current class for a 30-day trial period. (*Id.*) E.M.'s Parents agreed. (*Id.* at 388.) The following day, E.M. was disciplined with a loss of privileges because he reportedly pinned another student to the wall and threatened to hurt him. (*Id.* at 727.)

In January of 2017, E.M. was disciplined multiple times. On January 10, 2017, E.M. was suspended after he came into an office, kicked one of the adults, tried to lock the office door, and began screaming. (*Id.* at 727.) On January 12, 2017, E.M. was counseled for running into the resource room and pushing and grabbing at another student's clothes while yelling. (*Id.* at 726.) He was also suspended for breaking a popsicle stick in half and saying "it's a knife, I'm going to kill you" and waiving the stick in students' faces. (*Id.*) On January 26, 2017, E.M. was sent home for running around

---

[3] The District recommended that:

> E.M. would benefit from a structured classroom environment with clear expectations, a smaller adult to student ratio, consistent routine, a positive behavior system, that would provide immediate and frequent feedback throughout the day, sensory strategies, visual supports, and instruction to meet his academic, social skills and behavior/social needs.

(AR at 388.)

campus, running into classrooms, banging on doors, grabbing three students, and disregarding directions of multiple adults. (*Id.*) On January 30, 2017, E.M. received an in-school suspension for pushing his aide, screaming in the office, and physically "going after" another student. (*Id.* at 725.)

On February 1, 2017, E.M. was suspended for pushing and hitting his aide. (*Id.*) That same day, E.M.'s Parents agreed to place E.M. in the special day class at Westwood Elementary.[4] (*Id.* at 591.) The District agreed and E.M. was placed in the special day class beginning on February 6, 2017. (*Id.* at 592.) The District also agreed to provide "adult additional classroom support" for E.M. for 60 days to assist with the transition, as well as special education transportation services. (*Id.*) Notwithstanding his recent disciplinary incidents, on March 21, 2017, the parties met and agreed that E.M. was responding positively to his new class and school. (*Id.* at 395.)

In May of 2017, E.M. was disciplined multiple times. On May 8, 2017, he was suspended for assaulting five people at the start of the day and repeatedly attempting to assault a first-grade student in another class. (*Id.* at 724.) On May 16, 2017, E.M.'s Parents were called because he got off the bus and ran away from his teachers, and slammed his body into teachers and aides throughout the day. (*Id.*) On May 17, 2017, E.M. was suspended for repeatedly assaulting staff. (*Id.* at 723-24.) On May 24, 2017, E.M. was disciplined with loss of privileges for repeatedly grabbing and shaking a student. (*Id.* at 723.)

On September 5, 2017, at the beginning of his third-grade year in Westwood's special day class, E.M. was suspended for reportedly running through eight classes during instruction, assaulting one student, threatening further assault, and running off campus. (*Id.*) On September 6, 2017, the parties met to develop E.M.'s IEP. (*Id.* at 598.) Again, notwithstanding his recent disciplinary incidents, the parties agreed that "at this point

---

[4] E.M.'s complaint suggests that his Parents were informed of the suspension after agreeing to the new placement. (AR at 181.)

[E.M.] is not displaying a lot of autism characteristics at school and is doing well socially and pragmatically at school, at this time." (*Id.* at 638.) E.M.'s Parents expressed concern regarding closing a gap in his reading and writing. (*Id.*) Due to time constraints and a need to complete assessments, the parties agreed to reconvene later to complete the IEP. (*Id.*)

On October 16, 2017, a District occupational therapist completed a school based-occupational therapy evaluation. (*Id.* at 643.) On October 24, 2017, Ms. Cummings, a school psychologist, completed an educationally related mental health services assessment ("ERMHS assessment"). (*Id.* at 398.) On October 25, 2017, Ms. Klock, another school psychologist, completed a pyscho-educational assessment report. (*Id.* at 652.) Ms. Cummings' and Ms. Klock's assessments listed 14 recommendations for controlling E.M.'s negative behaviors. (*Id.* at 408-09, 675.) On October 25, 2017, the parties met to continue discussing E.M.'s IEP. (*Id.* at 641-42.) The parties developed goals related to reading, writing, communication, behavior, social-emotional goals, and fine motor skills, (*id.* at 94-96), but due to time constraints, the IEP was not completed and the parties agreed to reconvene later, (*id.* at 642).

On December 14, 2017, the parties met to continue discussing E.M.'s IEP during which E.M.'s special education teacher, Ms. Romero, gave a report. (*Id.* at 676.) The meeting notes state:

> [Ms. Romero] shared behavior data regarding his behavior (non-compliance, elopement, aggression) [and that] there has been an increase in aggression duration, and frequency. It is noted that there are increases and decreases, however, despite the many interventions, supports, and strategies, the patterns of behavior are not decreasing, they are at a maintenance level with very [few] demands. It was noted by [Ms. Romero] that with increases in demands then his behavior increases. His aggressive behavior is not really with intent to hurt someone, however the actions could hurt others or himself, it will necessitate adult attention, and there are safety concerns. [Ms. Romero] shared that his behavior impacts the learning of the other students as well. [Ms. Romero] reported a recent incident at an emergency drill, despite frontloading, and this drill occurring previously. He was very dangerous to the point that the class could not hear the call for the class to evacuate the

room.  She also noted that there are times that he can be completing a preferred activity and then begin attention seeking behavior which can then move to aggressive behavior.  It was also noted that with his behaviors, 100% of them are non-compliance.

(*Id*.)  In order to meet his goals, the District offered the following special education services: (1) specialized academic instruction for five hours per day; (2) individual counseling for 10 hours per year; (3) individual speech-language therapy for 15 hours per year; (4) individual occupational therapy for 15 hours per year; (5) an extended school year (to include specialized academic instruction for four hours per day, counseling for 15 minutes per week, speech language therapy for 20 minutes per week, occupational therapy for 20 minutes per week, and additional classroom support for four hours per day).  (*Id.* at 96-97.)  The parties agreed to develop a BIP to deal with E.M.'s non-compliance, aggression, and elopement.  (*Id.* at 97.)

At this December 14, 2017 meeting, the District also "recommended," for the first time, placing E.M. in a private school[5] and specifically recommended two private schools.  (*Id*. at 676-77.)  The record of the meeting states:

> [E.M.'s program specialist] presented program options and that the school team has implemented many various resources, supports, and interventions, and that his access to typical peers is very limited currently due to behavior and safety concerns.  Team discussed current level of behaviors and a need to move to a more supportive environment to address his behavior needs.  School team is recommending placement in a Non-Public School for this purpose.  The team discussed the process for this, and [the program specialist] and [Ms. Klock] provided information about Non-Public Schools in general, with specific recommendations for Springall Academy and San Diego Center for Children.  Transportation would be provided.  Parent was provided with Release of Information forms, which is necessary for the process of referrals to the schools.  Parent will take them home to review with her husband, and will contact [E.M.'s program specialist] regarding their decision. . . .

---

[5] The administrative record often uses the term "nonpublic school" or "NPS."  Because the IDEA statute uses the term "private school," *see*, *e.g.*, 20 U.S.C. § 1415(d)(2)(H), the court will use the term "private school" where possible.

> [O]ffer of [free appropriate public education] is placement in the [special day] class at [Westwood] until the next IEP meeting which will be scheduled after we receive word from the parents regarding the NPS process[.]

(*Id.*) At the meeting, E.M.'s Parents agreed that the special educational services and goals could be implemented immediately, but did not consent to placing E.M. in a private school. (*Id.* at 97, 677.)

On January 29, 2018, the parties met to continue discussing E.M.'s IEP. (*Id.* at 678.) Ms. Klock reported that she tried recommendations from the ERMHS assessment, but E.M.'s behaviors only increased. (*Id.*) The parties agreed to conduct another ERMHS assessment. (*Id.*) The record of the meeting states "a change of placement is still being offered due to [E.M.'s] behavior needs, and that he needs an environment that would provide more behavioral supports than are available in his current placement. . . . The [District's] offer of [free appropriate public education] is placement in a Non-Public School, start date would be determined[.]" (*Id.* at 679.) E.M.'s parents "stated [they] would like to move forward with the [annual review of E.M.'s IEP] but not . . . . a change in placement to a Non Public School." (*Id.* at 678.)

In February of 2018, E.M. was disciplined multiple times. On February 5, 2018, E.M. was suspended. (*Id.* at 722.) The disciplinary report states:

> [E.M.], on 2/05/18, holding plastic knives in both hands, attempted to stab another student. He then proceeded to kick other students, the classroom teacher and threatened to hit both the teacher and the principal. In addition, [E.M.] tore up the work of other students, damaged classroom furniture, destroyed printed curriculum and destroyed classroom decorations

(*Id.*) On February 13, 2018, E.M.'s Parents were called because he eloped from class and attempted to trip students. (*Id.* at 722.) On February 14, 2018, E.M.'s Parents were called because he destroyed another student's belongings and attempted to leave campus. (*Id.* at 721-22.) On February 16, 2018, E.M.'s Parents were called because he grabbed and tackled classmates then ran around the school. (*Id.* at 721.)

In March of 2018, E.M. was disciplined multiple times.  On March 1, 2018, E.M.'s Parents were called because he hit himself, yelled and screamed at classmates, and attempted to trip another student.  (*Id.*)  On March 2, 2018, E.M. was suspended for causing, attempting or threatening injury and terroristic threats.  (*Id.* at 720.)  The disciplinary report states:

> [E.M.], on 2/28 said, "Can I blow up the whole school?"  Beginning at 8:45AM and repeated four times.
>
> On 3/1 he was self injuring – hitting bare leg with ruler repeatedly, saying there was a bug on him, was assured there was no bug and continued – red mark that eventually faded.  At 11:30 the same day he said, "I want to blow up the whole school."
>
> On 3/2 the student said, "I have a bomb.  I'm going to blow up the classroom.  This is half TNT and half C4; I set the bomb to go off at 12 o'clock.  I hid a bomb.  Haha.  I hid a bomb in the classroom."
>
> . . . .
>
> Assistant Principal called the parent and described the incident to him and explained that [E.M.] was suspended for 3 days.  Parent was also notified that the police were called and would be performing a threat assessment [as required by law].

(*Id.*)  On March 16, 2018, E.M.'s Parents were called because he ran around class attempting to bother another student and called the teachers names.  (*Id.* at 719.)  On March 20, 2018, E.M. was "detained in office" for putting his hands on another student and knocking down the toys the student was playing with.  (*Id.*)  On March 21, 2018, E.M.'s Parents were called because he threw his backpack at another student.  (*Id.*)  On March 26, 2018, E.M. was "detained in office" for running from the bus to class, running from the class when presented with morning work, attempting to leave campus, and running through classrooms yelling and causing a lockdown.  (*Id.* at 718.)  On March 28, 2018, E.M. was disciplined with a loss of privileges for running from class, entering other classrooms yelling, and causing a lockdown of the school.  (*Id.*)  On March 29, 2018, E.M.

9

was "detained in office" for attacking a classmate and running around the school for 45 minutes. (*Id.* at 717.)

On March 16, 2018, a third school psychologist, Ms. Valencia, completed a second ERMHS assessment. (*Id.* at 680.)

In April of 2018, E.M. was disciplined multiple times. On April 2, 2018, E.M. was "detained in office" for running from class and around campus causing rooms to be locked. (*Id.* at 717.) On April 3, 2018, E.M. was "detained in office" for running around campus and targeting certain classrooms which were locked for safety. (*Id.* at 716.) On April 17, 2018, E.M. was counseled for running through classrooms and disrupting instruction. (*Id.*) On April 18, 2018, E.M. was "detained in office" and counseled for running around campus and disrupting other classrooms. (*Id.*) On April 26, 2018, E.M. was suspended for threatening to hit another student while riding the bus and threatening to evacuate the bus through the emergency exit.[6] (*Id.* at 715.)

On May 2, 2018, the District completed an assessment to determine whether E.M.'s behaviors resulting in suspensions on September 5th, February 2nd, March 2nd, and April 26th were manifestations of his disability. (*Id.* at 703-05.) The report includes a section titled "teacher observations" which states:

> Teacher reports that [E.M.] climbs trees/fences/furniture, yells out of anger at peers/adults, and screams high-pitched directly in peers' ears. [E.M.] argues with staff and name-calls staff/peers, grabs staff legs/tries to trip them, and head-butts teachers in their mid-section. [E.M.] elopes through campus while yelling (through classrooms), and has made attempts to leave campus. [E.M.] takes materials from students, shakes their bodies, laughs in their face, and tackles them, all of which occur unprovoked. [E.M.] teases peers, falsely accuses peers/adults of things, and threatens students verbally/physically.

---

[6] E.M.'s complaint states that "[E.M.'s] father asked that District to further investigate this claim. Following its investigation, District informed [E.M.'s] father that [E.M.] did not threaten to open the bus door. Instead, [E.M.] simply moved close to the emergency door and the driver feared he could open it." (AR at 185-86.)

[E.M.] erases student work, intentionally distracts peers from working, and throws away their work/personal items.  [E.M.] refuses to get on/off the bus, gets out of his seat while the bus is in motion, physically/verbally targets peers on the bus, and threatens to open the emergency exits.  [E.M.] engages in property destruction, uses technology without permission, throws objects at peers/adults, charges student with "sharp" Play-Doh tool, attempts/threatens to bite others, disrupts safety drills, hits his head with materials, hits his bare legs with the side of a ruler and says there are bugs on him, trips peers while they are running on the track and in class.  [E.M.] has dug under the school fence to elope from school, runs/hides in the bushes/behind portables/sheds, verbally threatens others saying things like, "I am going to get you," "Can I blow up the school" and "I have a bomb."

(*Id.* at 704.)  The report also includes a section for "parent input" which states:

The function of [E.M.'s] negative behaviors (including those resulting in the suspensions) were primarily to avoid and escape work or the classroom environment.  Avoidance of school work is a manifestation of his disability (ADHD).  Also at least one of the suspensions was a direct result of the district's failure to implement [E.M.'s] IEP.

(*Id.*)  The report concludes that E.M.'s behavior was caused by or had a direct and substantial relationship to E.M.'s disability and was not the result of the District's failure to implement the IEP.  (*Id.* at 704-05.)  E.M.'s Parents agreed that E.M.'s conduct was a manifestation of his disability, but disagreed that it was not the direct result of the District's failure to implement E.M.'s IEP.  (*Id.* at 186.)

On May 3, 2018, the parties met and the District again offered placement at a private school, as well as individual counseling services.  (*Id.* at 707-08.)  Ms. Valencia shared the results of the ERMHS assessment and recommended a trial of the counseling services for 30 minutes per week in place of the counseling E.M. was receiving at the time.  (*Id.* at 707.)  The District also offered to provide E.M. with an aide while riding the bus and E.M.'s Parents agreed.  (*Id.*)  The record of the meeting states "[the program specialist] reviews offer of [free appropriate public education] to be placement and it continues at Non-Public School[.]"  (*Id.* at 708.)

In May of 2018, E.M. was disciplined several more times. On May 15, 2018, E.M. was suspended for assaulting school staff and damaging school property. (*Id.* at 715.) On May 21, 2018, E.M. was disciplined with a behavior contract and loss of privileges for running around the school, being aggressive toward his classmates, and causing other students to be evacuated from the room. (*Id.* at 714.) On May 23, 2018, E.M. was suspended for repeatedly trying to leave campus and being physical with his aide and the principal. (*Id.* at 713.)

## II.    PROCEDURAL BACKGROUND

On June 18, 2018, E.M.'s Parents filed their initial complaint requesting a due process hearing with the Office of Administrative Hearings. (*Id.* at 1.) On August 1, 2018, the District filed its own complaint requesting a due process hearing. (*Id.* at 93.) E.M.'s Parents ultimately presented three issues for the ALJ to decide. (*Id.* at 742.) First, did the District deny E.M. a free appropriate public education (FAPE) because the December 2017 offer of private school placement was not E.M.'s least restrictive environment? (*Id.*) Second, did the District deny E.M. a FAPE from June 2016 to the date the complaint was filed in June 2018 when the District failed to develop E.M.'s IEP to include appropriate accommodations, modifications, supports, and services? (*Id.*) Third, did the District deny E.M. a FAPE by failing to initiate a due process hearing within a reasonable time after the IEP team reached an impasse regarding his placement in 2017? (*Id.*) The sole issue in the District's complaint was whether "the District's September 6, 2017 offer of program, services, and placement, as amended on October 26, 2017, December 14, 2017, January 29, 2018, and May 3, 2018 constitutes [E.M.'s FAPE] in his least restrictive environment[.]" (*Id.* at 187, 742.)

The ALJ found for the District on all three of E.M.'s issues. (*Id.* at 742-43.) On E.M.'s first issue, the ALJ found that private school was E.M.'s least restrictive environment because: (1) private school was appropriate because it provided a smaller effective environment to address E.M.'s behavior; (2) E.M.'s dysregulation, aggressions, defiance, sensory needs, and elopement could not be addressed in his current placement

on a comprehensive public-school campus; (3) E.M.'s behaviors created safety risks for him, his fellow students, and the staff; and (4) E.M. was not meaningfully interacting with typical peers in mainstreaming activities and was not accessing and benefiting from his educational placement. (*Id.* at 742.)

On E.M.'s second issue, the ALJ found that E.M.'s IEP was reasonably calculated to enable him to make appropriate progress in light of his circumstances because (1) from June 2016 through May 2017, the District convened eleven IEP team meetings and conducted seven assessments, and (2) the District used multiple sources to determine his present levels of performance, drafted and revised goals, gathered behavior data, and fine-tuned the BIP, while keeping E.M.'s Parents informed and involved. (*Id.* at 743.)

On E.M.'s third issue, the ALJ found that the District did not fail to initiate a due process hearing within a reasonable time after an impasse was reached regarding his placement because (1) the District's August 1, 2018 complaint was filed within three months of the May 2018 IEP meeting, and (2) the parties desired to mediate a second time and jointly requested to set the hearing for December 12, 2018, and the hearing was continued to January 24, 2019 because the E.M.'s Parents filed an amended complaint. (*Id.* at 743, 782.)

On the District's issue, although the ALJ found that private school was E.M.'s least restrictive environment, the ALJ also found that the District did not demonstrate that its December 2017 offer of private school placement, as amended at the May 2018 meeting, offered E.M. a FAPE in his least restrictive environment. (*Id.* at 784-86.) This was based upon the ALJ's finding that the District committed a procedural violation that significantly impeded E.M.'s Parents' opportunity to participate in the decision-making process, and therefore, amounted to a denial of a FAPE. (*Id.*) Specifically, the ALJ found the District failed to provide E.M.'s Parents with adequate information about the private school placement it was recommending, and thereby violated federal and state law requiring the District to make an offer that was sufficiently specific for Parents to evaluate. (*Id.*) Based on the information provided by the District, the ALJ found that E.M.'s Parents could not

make an informed decision as to whether they believed E.M.'s unique needs could be met in private school.  (*Id.*)  On August 23, 2019, the parties filed cross motions for summary judgment.  (Doc. Nos. 26, 27.)

## III.  LEGAL STANDARDS

The IDEA statute's "core" is the "cooperative process that it establishes between parents and schools," the "central vehicle" of which is the development of an IEP.  *Schaffer v. Weast,* 546 U.S. 49, 53 (2005).  A party objecting to an IEP may invoke IDEA's "procedural safeguards."  20 U.S.C. § 1415; *see also Winkelman v. Parma City Sch. Dist.,* 550 U.S. 516, 525-26 (2007).  These safeguards include the opportunity for "any party to present a complaint" concerning "any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child."  20 U.S.C. § 1415(b)(6).  A complaint initiates a process of review that can include, in relevant part, a preliminary meeting and an impartial due process hearing conducted by the state or local educational agency.  *Id.* at § 1415(f)(1).  Once the state educational agency has reached a decision, an aggrieved party may sue in federal court.  *Winkelman,* 550 U.S. at 526 (citing § 1415(i)(2)(A)).

In appeals of administrative decisions in federal court, IDEA provides "the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(e)(2).  The Federal Rules of Civil Procedure "do not plainly speak to how such appeals should be handled."  *L.M. v. Capistrano Unified Sch. Dist.,* 556 F.3d 900, 891 (9th Cir. 2009).  Such appeals, however, generally involve disputed issues of material fact.  *Id.*  Thus, using a summary judgment framework to appeal administrative decisions under IDEA presents a "puzzling procedural problem."  *Id.* at 892.  To resolve this problem, the Ninth Circuit has held that "[t]hough the parties may call the procedure a 'motion for summary judgment' in order to obtain a calendar date from the district court's case management clerk, the procedure is, in substance, an appeal from an administrative determination, not

a summary judgment." *Id.*; *see also Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1472 (9th Cir. 1993) ("Although this procedure is permissible under the IDEA, it is not a true summary judgment procedure. Instead, the district court essentially conduct[s] a bench trial based on a stipulated record."); *J.L.N. v. Grossmont Union High Sch. Dist.*, Case No. 17cv2097 L (MDD), 2019 WL 4849172, at *4 (S.D. Cal. Sept. 30, 2019) (treating cross motions for summary judgment as an appeal of an administrative decision).

The Supreme Court has held that IDEA's procedural safeguard provision "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review. . . . The fact that § 1415(e) requires that the reviewing court 'receive the records of the [state] administrative proceedings' carries with it the implied requirement that due weight shall be given to these proceedings." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 206 (1982).

Although a substantial body of caselaw exists defining the nature and limits of judicial discretion in IDEA matters, independent review informed by careful consideration of an ALJ's thoughtful analysis would seem to encapsulate this court's task. A sampling of the finely spun attenuations of this standard follows: *Cty. of San Diego v. California Special Educ. Hearing Office*, 93 F.3d 1458, 1466 (9th Cir. 1996) ("At bottom, the court itself is free to determine independently how much weight to give the administrative findings in light of the enumerated factors."); *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1524 (9th Cir. 1994) ("The extent of deference to be given is within our discretion."); *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1311 (9th Cir. 1987) (the deference afforded the ALJ's decision "is a matter for the discretion of the courts").

This does not mean the ALJ's findings can be ignored. *Longview*, 811 F.2d at 1311; *see also M.C. v. Antelope Valley Union High Sch. Dist.*, 858 F.3d 1189, 1195 n.1 (9th Cir. 2017) ("[B]lind deference is not appropriate. Rather, the district judge must actually examine the record to determine whether it supports the ALJ's opinion."), *cert. denied*, 138 S. Ct. 556 (2017); *Capistrano*, 59 F.3d at 892 ("The district court's

independent judgment is not controlled by the hearing officer's recommendations, but neither may it be made without due deference."); *Ojai*, 4 F.3d at 1474 ("Despite their discretion to reject the administrative findings after carefully considering them . . . . courts are not permitted simply to 'ignore the administrative findings.'") (citation omitted). Accordingly, the Ninth Circuit has held that in reviewing administrative findings, "'[t]he court, in recognition of the expertise of the administrative agency, must consider the findings carefully and endeavor to respond to the hearing officer's resolution of each material issue. After such consideration, the court is free to accept or reject the findings in part or in whole.'" *Longview*, 811 F.2d at 1311 (quoting *Town of Burlington v. Dept. of Ed.,* 736 F.2d 773, 792 (1st Cir. 1984), *aff'd,* 471 U.S. 359 (1985)).

The Ninth Circuit has also held that "[w]e give deference to the administrative findings of the Hearing Officer particularly when . . . . they are thorough and careful." *Union*, 15 F.3d at 1524; *see also R.B. v. Napa Valley Unified Sch. Dist.*, 496 F.3d 932, 937 (9th Cir. 2007) ("The court gives particular deference where the hearing officer's administrative findings are 'thorough and careful.'"); *Cty. of San Diego*, 93 F.3d at 1466-67 ("This circuit gives the state hearing officer's decision 'substantial weight' when it 'evinces his careful, impartial consideration of all the evidence and demonstrates his sensitivity to the complexity of the issues presented.'") (quoting *Ojai,* 4 F.3d at 1476); *Capistrano*, 59 F.3d at 891 ("The amount of deference accorded the hearing officer's findings increases where they are 'thorough and careful.'"); *but see Antelope Valley*, 858 F.3d at 1194 ("We can accord some deference to the ALJ's factual findings, but only where they are 'thorough and careful[.]'"). A court "treat[s] a hearing officer's findings as 'thorough and careful' when the officer participates in the questioning of witnesses and writes a decision contain[ing] a complete factual background as well as a discrete analysis supporting the ultimate conclusions." *Napa Valley,* 496 F.3d at 942-43. "But neither the duration of the hearing, nor the ALJ's active involvement, nor the length of the ALJ's opinion can ensure that the ALJ was 'thorough and careful.'" *Antelope Valley*, 858 F.3d at 1194.

## IV. DISCUSSION

The IDEA statute assures that all children with disabilities receive a FAPE through an IEP. 20 U.S.C. § 1400(d)(1)(A); *Capistrano,* 556 F.3d at 909. Under IDEA, Congress conditions federal funding upon state compliance with the statute's "extensive substantive and procedural requirements." *Hoeft v. Tucson Unified Sch. Dist.,* 967 F.2d 1298, 1300 (9th Cir. 1992). In *Rowley,* the Supreme Court held that a school district complies with IDEA if the school district (1) complies with the statute's procedures, and (2) develops an IEP reasonably calculated to enable the child to receive educational benefits. 458 U.S. at 206-07. "If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more." *Id.* at 207.

### A. The District's Procedural Compliance Regarding Its Private School Offer

The ALJ addressed the District's compliance with IDEA's procedural requirements that (1) placement offers be sufficiently specific, and (2) if an impasse is reached, school districts must, with reasonable promptness, file for a due process hearing.

### 1. Specificity of the District's Placement Offer

The ALJ decided that the District violated IDEA's procedural requirements by failing to provide E.M.'s Parents with sufficiently specific information about its offer to place E.M. in private school. (AR at 784-86.) The ALJ also decided this procedural violation amounted to a denial of a FAPE because it significantly impeded E.M.'s Parents' opportunity to participate in the decision-making process. (*Id.*) In support of his decision, the ALJ found that under *Union,* 15 F.3d at 1526, a school district's offer to place a child in a private school must be sufficiently specific. (AR at 782, 785.)

### a. Placement Offer Standard

The ALJ correctly recognized that a school district's failure to make a sufficiently specific placement offer is a procedural violation of IDEA and a denial of a FAPE if the failure significantly impedes the child's parents' opportunity to participate in the decision-making process. Under IDEA, school districts must provide parents with written prior

17

notice whenever the district proposes to change the child's educational placement. 20 U.S.C. § 1415(b)(3). The notice must include: (1) a description of the proposed placement; (2) an explanation why the district proposes to make the placement and a description of each evaluation procedure, assessment, record, or report the district used as a basis for the proposed placement; (3) a description of other options considered by the IEP team and the reason why those options were rejected; and (4) a description of the factors that are relevant to the district's proposal or refusal. 20 U.S.C. § 1415(c)(1).

The Supreme Court has emphasized the importance of complying with IDEA's procedural requirements. In *Rowley*, the Court stated "Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process as it did upon the measurement of the resulting IEP against a substantive standard." 458 U.S. at 205-06 (citing 20 U.S.C. §§ 1415(a)-(d)); *see also Endrew F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 1000 (2017) ("[T]he procedures are there for a reason, and their focus provides insight into what it means, for purposes of the FAPE definition, to 'meet the unique needs' of a child with a disability."). The Ninth Circuit has explained that while "technical violations" of IDEA's procedural requirements may not necessarily deny a FAPE, "procedural inadequacies that . . . . seriously infringe the parents' opportunity to participate in the IEP formulation process . . . . clearly result in the denial of a FAPE." *Amanda J. v. Clark Cty. Sch. Dist.*, 267 F.3d 877, 892 (9th Cir. 2001) (internal citations and quotation marks omitted). Accordingly, federal and state law provide that an ALJ may find that a child did not receive a FAPE if the procedural inadequacies "significantly impeded the parents' opportunity to participate in the decisionmaking process[.]" 20 U.S.C. § 1415(f)(3)(E)(ii); Cal. Educ. Code § 56505(f)(2)(B); *see also N.B. v. Hellgate Elementary Sch. Dist.*, 541 F.3d 1202, 1208 (9th Cir. 2008) (under IDEA, school districts must also comply with state regulations, which are enforceable in federal court) (citation omitted).

Furthermore, placement offers under IDEA must be formal, written, and specific. *Union*, 15 F.3d at 1526. In *Union*, the school district desired to place a child with autism

spectrum disorder into a special school, but the district conceded that it never made a formal offer to place the child in the school because it believed the parents would not agree. *Id.* at 1524. The court held "a school district cannot escape its obligation under the IDEA to offer formally an appropriate educational placement by arguing that a disabled child's parents expressed unwillingness to accept that placement." *Id.* at 1526. The court stated:

> We find that this formal requirement has an important purpose that is not merely technical, and we therefore believe it should be enforced rigorously. The requirement of a formal, written offer creates a clear record that will do much to eliminate troublesome factual disputes many years later about when placements were offered, what placements were offered, and what additional educational assistance was offered to supplement a placement, if any. Furthermore, a formal, specific offer from a school district will greatly assist parents in "present[ing] complaints with respect to any matter relating to the . . . . educational placement of the child." 20 U.S.C. § 1415(b)(1)(E).

*Id.*; *see also J.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431, 459 (9th Cir. 2010) ("Pursuant to the IDEA, [the] District must make a formal, specific written offer of placement.") (citing *Union,* 15 F.3d at 1526). Based on the above, the ALJ identified the correct legal standard regarding the District's offer to place E.M. in a private school.

### b. The District's Arguments

The District bears the burden of demonstrating that the ALJ's decision regarding the District's placement offer should be reversed. *Fresno Unified*, 626 F.3d at 438. The court reviews the ALJ's decision under a preponderance of evidence standard. 20 U.S.C. § 1415(e)(2). For the below reasons, the District does not meet its burden.

### i. Offer Specificity

The District first argues that its offer to place E.M. in private school was specific because "[t]he December 2017 IEP, as amended in May 2018, offered [E.M.] placement in a [private school], on a small therapeutic campus, that could implement his BIP and IEP goals, and provide the necessary counseling/ERMHS services that were set forth in the IEP." (Doc. No. 27 at 29-30.) Even if such an offer would have been sufficiently

specific, the record does not support that this was the offer made by the District. The portions of the record the District cites to support this description of the offer, i.e. the records memorializing the December 2017 and May 2018 IEP meetings, do not show that any such offer was made. (*See* AR at 676-77; 707-08.) Rather, the record of the December 2017 meeting merely shows that placement in a private school was "recommended" for the purpose of moving E.M. to a "more supportive environment to address his behavior needs." (*Id.* at 676.) The record also shows that the District provided information about "*Non-Public schools in general*, with specific recommendations for Springall Academy and San Diego Center for Children."[7] (*Id.* (emphasis added).) The records of the meetings in January and May of 2018 are similarly unspecific. The January 2018 record states "a change of placement is still being offered due to [E.M.'s] behavior needs, and that he needs an environment that would provide more behavioral supports than are available in his current placement. . . . The [District's] offer of FAPE is placement in a Non-Public School, start date would be determined[.]" (*Id.* at 679.) The record of the May 2018 meeting states "offer of FAPE to be placement and it continues at Non-Public School[.]" (*Id.* at 708.) Although the ALJ found that the District's "offer of nonpublic school placement was appropriate because it provided a smaller and more therapeutic environment," (*id.* at 784), the record does not suggest the District provided any information in its offer that either of the two private schools it recommended had a "small therapeutic campus," "could implement [E.M.'s] BIP and IEP goals," or could "provide the necessary counseling/ERMHS services that were set forth in the IEP," (Doc. No. 27 at

---

[7] The record shows that the District intended *not* to make a formal, written and specific offer at the December 2017 meeting. The record of the meeting states "offer of FAPE is [continued] placement in the [special day class] until the next IEP meeting which will be scheduled after we receive word from the parents regarding the [private school] process[.]" (AR at 677.) It was not until the next meeting, on January 29, 2018, that the District expressly offered private school placement. (*See id.* at 679.)

29-30). At the subsequent hearing, District personnel explained that private schools are "generally speaking . . . . considered to be more therapeutic." (*Id.* at 1106.) To the extent that the District attempted to provide specific information about the private school placement offer at the subsequent hearing before the ALJ, (*see* Doc. No. 27 at 8), under the snapshot rule, the court must judge the appropriateness of the offer on the basis of the information reasonably available to the parties at the time the offer was made. *L.J. v. Pittsburg Unified Sch. Dist.*, 850 F.3d 996, 1004 (9th Cir. 2017). As pointed out by E.M., in addition to failing to arrange for a representative from either school to attend a meeting with E.M.'s Parents as required by 34 C.F.R. § 300.325(a)(2), the District did not have a representative from either private school testify at the hearing before the ALJ. There is nothing in the record to suggest, and the District does not expressly contend, that its personnel involved in the private school placement offer were knowledgeable about the services or programs available at Springall or San Diego Center for Children or shared that knowledge with E.M.'s Parents. Based on the above, the District has not shown that its offer of private school placement was specific. To the contrary, the preponderance of evidence shows the offer was not specific, especially when juxtaposed with the notice requirements of 20 U.S.C. § 1415(c)(1).[8]

### ii. Parental Participation

The District argues that even if its offer of private school placement was not specific, E.M.'s Parents' opportunity to participate in the decision-making process was not significantly impeded and therefore did not amount to a denial of a FAPE. (Doc. No.

---

[8] Given that the only contemporaneous record of the offer is contained in notes of the December 2017, January 2018 and May 2018 meetings, it is also questionable whether the District ever made a "formal" and "written" offer. While the meeting notes memorializing the offer are written and were given to E.M.'s parents to review, there is nothing in the record suggesting that the District provided E.M.'s Parents with a letter, contract, form, or some other type of a formal written offer. It is also questionable whether the District complied with the detailed notice requirements in 20 U.S.C. § 1415(c)(1), but neither E.M. nor the ALJ raised this issue.

27 at 30.) The District first points out that E.M.'s parents were active participants in the IEP meetings in which the District raised the issue of private school. (*Id.*) Although some courts have noted parents' participation in meetings as one of multiple factors supporting a finding that those parents reasonably understood a placement offer, *see, e.g.*, *Fresno Unified,* 626 F.3d at 460, *Fermin v. San Mateo-Foster City Sch. Dist.*, Case No. 99cv3376 SI, 2000 WL 1130070, at *10 (N.D. Cal. Aug. 4, 2000), others have found the failure to make a formal and specific placement offer is a *per se* denial of a FAPE, *see, e.g.*, *Redding Elementary School District v. Goyne,* Case No. 00cv1174 WBS (GGH), 2001 WL 34098658, *5 (E.D. Cal. Mar. 26, 2001). Here, E.M.'s Parents could not have sufficiently understood the placement offer because, other than specifying that it included private school, the offer was totally lacking in detail, including crucial details like the services and programs available to E.M. The District's offer did not even confirm that either of the private schools it recommended accepted children with E.M.'s special educational needs or had space for him. (AR at 1010.) The Ninth Circuit has stressed that "[w]hen a parent is unaware of the services offered to the student . . . . a FAPE has been denied, whether or not the parent had ample opportunity to participate in the formulation of the IEP." *Antelope Valley*, 858 F.3d at 1198. E.M.'s Parents' active involvement in his education in no way diminishes E.M.'s rights, or the District's IDEA obligations.

Second, the District claims that its offer was specific because the offer was "discussed, including a discussion regarding the programs available at Springall and San Diego Center" and the District "provided the Parents with information regarding each of the proposed [private schools] and shared that [E.M.'s] IEP could be implemented at each school." (Doc. No. 27 at 30.) Certainly, the record supports that some "discussion" of the District's private school offer occurred and that some "information" was provided. (*See* AR at 783, 785.) Any reference to unspecified information and discussion, however, does not show that the District's offer was sufficiently specific. Moreover, the District does not cite anything in the record supporting its contentions that a discussion occurred regarding the "programs available" at either school or that the District "shared" that E.M.'s

IEP could be implemented at either school. As noted above, the record shows that the District merely provided information about private schools "in general" along with specific "recommendations" for two private schools. (*Id*. at 676 (emphasis added).) Although at the December 2017 IEP meeting the District provided E.M.'s Parents with some information pulled from the internet about the schools, (*id*. at 852, 1002, 1011), the District offers no evidence suggesting the materials contained any specific information that satisfied its obligations under IDEA. Instead, the District states broadly that the materials "contained information regarding the proposed programs." (Doc. No. 27 at 31.) Based on this evidentiary record, however, the only specific information about the offer of private school placement were the names of two private schools. (AR at 785.)

Third, the District points out that E.M's Parents did not sign the release of information, did not request to visit either private school, and did not ask questions about the schools. (Doc. No. 30 at 33.) With respect to the release of information, the District claims the signed release would have "allow[ed] the District to speak with the [private school] placements specifically about [E.M.] and determine which school would be best." (*Id*. at 23.) Certainty, the record supports the refusal of E.M.'s Parents to sign the release form. (AR at 676, 1011, 1017, 1019, 1029, 1036.) The District was also clearly under the impression that it needed releases to be signed. (*See id*. at 677 (stating that the release form was "necessary for the process of referrals to the schools"); 1261-62 (stating that asking parents for a release of information was "in general" part of the referral process).) The District does not explain, however, how exactly its obligations to protect E.M.'s privacy or E.M.'s Parents' refusal to sign a release prevented the District from making a specific placement offer.[9] As noted by E.M.'s Parents, their refusal to sign the release form did not, *per se*, prohibit the District from speaking in hypotheticals to private schools about E.M. (*Id*. at 1029.) Overall, as recognized by the ALJ, E.M.'s Parents' refusal to

---

[9] For example, the District does not cite the authority protecting students' information or identify what information is protected.

sign a release did not relieve the District of its duty to make a clear placement offer. *See A.V. v. Lemon Grove Sch. Dist.*, Case No. 16cv0803 CAB (BLM), 2017 WL 733424, at *12 n.16 (S.D. Cal. Feb. 24, 2017) (finding that the school district committed a procedural violation despite parents' refusal to sign a release form that the district alleged would have allowed it to share information with a private school at which it was considering placing the child). Similarly, the reluctance of E.M.'s Parents' to ask questions or request a tour did not relieve the District of its obligations under IDEA. The Ninth Circuit has made abundantly clear that parents' disinterest in a placement offer is no excuse. *See Anchorage School Dist. v. M.P.,* 689 F.3d 1047, 1055 (9th Cir. 2012); *Union*, 15 F.3d at 1526; *see also Bookout v. Bellflower Unified Sch. Dist.*, Case No. 13cv2710 SH, 2014 WL 1152948, at *10 (C.D. Cal. Mar. 21, 2014) ("[I]t is clear under Ninth Circuit law, that Parents' unwillingness to consider [a placement] did not relieve the District of its obligation to make a specific offer of educational placement.") (citation omitted).

Fourth, the District argues its offer was specific because it "did not offer multiple [private school] placements and force the parent to decide." (Doc. No. 27 at 30.) The District states that it "only proposed Springall and San Diego Center as *possible* [private school] options that *could* be appropriate to meet [E.M.'s] unique needs and implement the IEP." (*Id.* (emphasis added).) Contrary to the District's assertion, the District *did* offer multiple private school placements: Springall Academy and San Diego Center for Children. (AR at 676.) The District's contention that the schools were merely "possible options" suggests the number of potential placements was even greater. While the District was not "forcing" E.M.'s Parents to decide E.M.'s placement, by "proposing" two schools that "could be appropriate," but never identifying a specific school that was appropriate, the District reasonably implied that it was up to E.M.'s Parents to decide. Like the ALJ found here, most courts have found that offers containing multiple placement options are insufficiently specific. *See J.P. v. Los Angeles Unified Sch. Dist.*, Case No. 09cv01083 MMM (MANx), 2011 WL 12697384 (C.D. Cal. Feb. 16, 2011) (three schools); *Glendale Unified Sch. Dist. v. Almasi*, 122 F. Supp. 2d 1093, 1107 (C.D. Cal. 2000) (four

placements); *see also A.K. v. Alexandria City School Board*, 484 F.3d 672 (4th Cir. 2007) (five placements); *but see Fresno Unified,* 626 F.3d at 460-61 (making an initial offer of placement at four schools did not deny a FAPE because the options were extensively discussed and the district eventually offered a single placement); *Fermin*, 2000 WL 1130070, at *10 (offer stating that the school district "continues to offer a range of placements in [county] special day class programs" was sufficiently specific because the child was previously in the program and the parents understood the substantive components of the program, even if they did not know the exact location).

Finally, the District asserts that its "goal the entire time [was] to collaborate with [E.M.'s] parents *subsequent* to receiving consent to share [E.M.'s] records with the two [private schools] and visitations by [E.M.'s] parents at the two [private schools]." (Doc. No. 27 at 30 (emphasis added).) While it is apparent from the record the District sought E.M.'s Parents' consent to place E.M. in a private school *generally*, a general placement offer is, of course, in direct conflict with *Union's* requirement that placement offers be specific. The District's intent to make a specific placement offer at some point in the future only serves to bolster the ALJ's finding that the District had not made a specific offer by the time E.M.'s parents filed their complaint. As recognized in *Union*, the purpose of requiring school districts to make specific placement offers is to create a "clear record" and "eliminate troublesome factual disputes" so that parents can more efficiently challenge placement decisions. 15 F.3d at 1526 ("[A] formal, specific offer from a school district will greatly assist parents in 'present[ing] complaints with respect to any matter relating to the . . . . educational placement of the child'" (quoting 20 U.S.C. § 1415(b)(1)(E)). Without a specific placement offer, E.M.'s Parents, as well as the ALJ and court, are left to decide the appropriateness of a placement offer that is incomplete. As stated by the district court in *Glendale*:

> Discussion of a range of possible placements during the IEP meeting is, of course, appropriate. However, a school district cannot abdicate its responsibility to make a specific offer allowing a parent to choose from among several programs presented as formal offers. After discussing the advantages

and disadvantages of various programs that might serve the needs of a particular child, the school district must take the final step and clearly identify an appropriate placement from the range of possibilities. It was the District's responsibility to use its expertise to decide which program was best suited for [the child's] unique needs. Thus, under *Union*, the District [must] articulate a clear, coherent offer which [the parent] reasonably could evaluate and decide whether to accept or appeal.

122 F. Supp. 2d at 1108; *see also Alexandria*, 484 F.3d 672 (adopting *Glendale* as consistent with *Union*).[10] Based on the above, the District has not demonstrated that it did not significantly impede E.M.'s parents' opportunity to participate in the decision-making process. The preponderance of evidence shows that E.M.'s Parents could not have reasonably evaluated the District's general offer of private school placement.

### c. The ALJ's Factual Findings

In support of his decision, the ALJ made the following factual findings: (1) the offer did not specify the classroom, type of curriculum, or contents of the program at either private school; (2) no representative from either private school was present at the IEP meeting; (3) the District spoke in generalities as to what the private schools provided; (4) the District provided the school names, printouts from the schools' websites, and releases for E.M.'s Parents to sign; (5) the District did not offer to arrange tours of the schools; (6) the District did not have its own educational professionals,[11] like Ms.

_____

[10] The District also claims that its offer was specific because it was "seeking consent to the specific *type* of placement, that being a [private school] setting." (Doc. No. 27 at 31 (emphasis added).) This is contrary to *Union* and is akin to arguing that general offers to place children in private or public school are specific. The District also fails to cite any authority suggesting that a general offer to attend private school satisfies IDEA's requirement to make a specific placement offer, or that this is a regular or accepted practice.

[11] The ALJ gave the additional reason that "[District] staff who had additional knowledge of the recommended nonpublic schools' programs were not present at the IEP meeting." (AR at 785.) The ALJ does not specify the staff that were absent, but given his subsequent reference to Ms. Cummings, he was likely referring to Ms. Cummings.

Cummings, whose duties included serving students in private schools, including Springall, at the IEP meeting; and (7) the District did not provide more meaningful or comprehensive information in the two meetings following the December 2017 meeting.  (AR at 785.)

The District challenges few, if any, of the ALJ's factual findings.  While the District states "the ALJ incorrectly found that the District failed to provide [E.M.'s] parents with specific information regarding the classroom [E.M.] would be placed in or the curriculum that would be used," (Doc. No. 27 at 29), nothing in the record suggests that the District provided any information about the classroom or curriculum at either school at any point. (*See* AR at 676, 678, 707.)  District courts have found the failure to specify the classroom, curriculum and program contents of a placement offer is a procedural violation that denies a FAPE.  *See*, *e.g.*, *Bellflower*, 2014 WL 1152948, at *10 (school district's offer of placement in a special day class with five potential classrooms was insufficiently specific); *Glendale*, 122 F. Supp. 2d at 1107 ("[T]he District's offer of various types of classrooms, located at a number of different school sites, with varying school-day durations, does not comport with the *Union* requirement that the District make a formal, specific placement offer.").

The record also supports, and the District does not dispute, the ALJ's finding that no representative from either school was present at the IEP meeting.  (AR at 785.)  As pointed out by E.M., "[b]efore a public agency places a child with a disability in, or refers a child to, a private school or facility, the agency must initiate and conduct a meeting to develop an IEP for the child . . . . [and] ensure that a representative of the private school or facility attends the meeting."  34 C.F.R. § 300.325(a).  "If the representative cannot attend, the [district] must use other methods to ensure participation by the private school or facility, including individual or conference telephone calls."  *Id.* at § 300.325(a)(2). The parties do not dispute that the District failed to ensure that a representative from either private school it recommended attended or otherwise participated in any meeting with E.M.'s Parents.  While the ALJ listed the absence of a private school representative at the IEP meetings as one of the reasons for finding that the private school placement offer was

insufficiently specific, (AR at 785), the ALJ did not base his decision on that particular procedural violation, and E.M. only briefly references the violation in his motion, (Doc. No. 33 at 2 ("The District . . . . flouted federal law and failed to bring [private school] representatives to the IEP meetings[.]").) Indeed, District courts have found that this particular procedural violation does necessarily amount to a denial of a FAPE. *See*, *e.g.*, *Lemon Grove*, 2017 WL 733424, at *13 (parents met with the private school outside of IEP meetings, discussed the school with the IEP team, and stipulated that the school was appropriate); *Student R.A. v. West Contra Costa Unified Sch. Dist.,* Case No. 14cv931 PJH, 2015 WL 4914795, at *19 (N.D. Cal. Aug. 17, 2015) (the school district arranged for the parents to tour the private school and meet with its staff, which the parents did); *but see Werner v. Clarkstown Cent. Sch. Dist.*, 363 F. Supp. 2d 656, 659 (S.D.N.Y. 2005) (failure to have a representative from a proposed private school denied a FAPE even though there was no dispute as to the propriety of the placement). Overall, the absence of a representative from either private school at any of the IEP meetings, in conflict with IDEA regulations, supports the ALJ's conclusion that E.M.'s Parents were significantly deprived of the opportunity to participate in the decision-making process on whether the schools offered a placement that was appropriate for E.M.'s unique needs.

The record also supports the remainder of the ALJ's factual findings. The District spoke in generalities as to what the nonpublic schools provided. (*See* AR at 676 (noting that E.M.'s parents were provided with information about private schools "in general").) The District merely provided the school names, (*id*. at 785), printouts from the schools' websites, (*id*. at 852, 1002, 1011), and releases for E.M.'s Parents to sign, (*id*. at 676). The District did not offer to arrange for E.M.'s Parents to tour any private school. (*Id*. at 1007-08, 1010-11, 1016.) Ms. Cummings' other duties included serving students in private schools, including at Springall, and she was not at the IEP meetings in December 2017, January 2018 or May 2018. (*Id*. at 676, 678, 707, 1096-97.) Finally, the District did not provide more information, and certainly not meaningful or comprehensive information, at the two meetings following the December 2017 meeting. (*See id*. at 678,

707.) Based on the above, the ALJ's factual findings are supported by the record and the preponderance of evidence shows the District's offer was insufficiently specific.

## 2. The District's Filing Delay

The ALJ also decided that the District did not unreasonably delay filing for a due process hearing. (AR at 781.) As the party seeking reversal of this decision, E.M. bears the burden of proof. E.M. argues that (1) the parties reached an impasse on January 29, 2018 when E.M.'s Parents informed the District that they did not accept the offer of private school, and (2) the District failed to fulfill its obligation to initiate, with reasonable promptness, a due process hearing by filing its complaint on August 1, 2018, 184 days later. (Doc. No. 26 at 31.) For the below reasons, E.M. does not meet his burden.

California Education Code § 56346(f) provides that "if the public agency determines that the proposed special education program component to which the parent does not consent is necessary to provide a free appropriate public education to the child, a due process hearing shall be initiated[.]" The Ninth Circuit has held that "[i]n effect, § 56346(f) compels a school district to initiate a due process hearing when the school district and the parents reach an impasse." *I.R. v. Los Angeles Unified Sch. Dist.*, 805 F.3d 1164, 1169 (9th Cir. 2015). "In evaluating how long is too long for a school district to take in determining a component's necessity and initiating a due process hearing, [the court must] recognize that the school district must have some flexibility to allow for due consideration of the parents' reasons for withholding consent to an IEP component." *Id*. "If in the school district's judgment," however, "the child is not receiving a FAPE, the district must act with reasonable promptness to correct that problem by adjudicating the differences with the parents." *Id*. at 1170.

The record shows that on January 29, 2018 the parties met, the District offered private school placement, and E.M.'s Parents did not accept the offer. (*Id*. at 678-79.) As pointed out by the ALJ, it is at least questionable that an impasse occurred at this point because E.M.'s Parents agreed to continue with the annual review of E.M.'s IEP, as well as to another ERMHS assessment, (*id*.), and at the subsequent meeting on May 3, 2018,

the District amended its offer of a private school placement to include different mental health services, (*id*. at 708). On June 18, 2018, E.M.'s Parents filed their initial complaint with the assistance of counsel. (*Id*. at 1.) On August 1, 2018, the District filed its own complaint requesting a due process hearing. (*Id.* at 93.)

While a delay of six months, or even three months, might not be reasonably prompt, E.M. does not point to any binding authority that such a delay constitutes a procedural violation, or the loss of educational opportunity or benefit, or seriously infringes upon parents' opportunity to participate in the IEP formulation process. *See Amanda J.*, 267 F.3d at 892. During the delay, E.M. remained at Westwood, which was consistent with his Parents' wishes. The only prejudice E.M.'s Parents suggest they suffered due to the delay was incurring attorney's fees in filing their own complaint. (Doc. No. 26 at 31.) They do not allege, however, that they might not have retained an attorney and filed their complaint but for the District's delay in filing its complaint. *See Antelope Valley*, 858 F.3d at 1197 (finding that had the school district disclosed a mistake in the IEP at an earlier date, "[p]laintiffs might have avoided hiring a lawyer and taking the case to a due process hearing"). Based on the above, E.M. does not meet his burden of showing that he was denied a FAPE by the District's delay in filing for a due process hearing.

## B. Substantive Issues

The ALJ also addressed the District's compliance with IDEA's substantive requirements that school districts provide (1) an IEP reasonably calculated to enable the child to receive educational benefits, and (2) a FAPE in the child's least restrictive environment.

### 1. Appropriate IEP and BIP

As noted above, the IEP is the "centerpiece" of IDEA's "education delivery system" for children with disabilities. *Honig v. Doe*, 484 U.S. 305, 311 (1988). An IEP is a written statement for each child that is developed, reviewed, and revised annually. 20 U.S.C. § 1414 (d)(1)(A)(i). The IEP must include: (1) a statement of the child's present levels of academic achievement and functional performance; (2) a statement of measurable annual

goals, including academic and functional goals; (3) a description of how the child's progress toward meeting the annual goals will be measured; (4) a statement of the special education and related services to be provided to the child; (5) an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class; (6) the projected date for the beginning of services and modifications; and (7) the anticipated frequency, location, and duration of the services and modifications. *Id.* "[A] school district can be liable for a substantive violation [of IDEA] by drafting an IEP that is not reasonably calculated to enable the child to receive educational benefits." *Fresno Unified*, 626 F.3d at 432-33.

The IDEA statute further provides that "[s]chool personnel may consider any unique circumstances on a case-by-case basis when determining whether to order a change in placement for a child with a disability who violates a code of student conduct." 20 U.S.C. § 1415(k)(1)(A). The statute also provides:

> If the local educational agency, the parent, and relevant members of the IEP Team make the determination that the conduct was a manifestation of the child's disability, the IEP Team shall (i) conduct a functional behavioral assessment, and implement a behavioral intervention plan for such child [and] (ii) in the situation where a behavioral intervention plan has been developed, review the behavioral intervention plan if the child already has such a behavioral intervention plan, and modify it, as necessary, to address the behavior[.]

*Id.* at § 1415(k)(1)(F).

The ALJ found that E.M. did not prove by a preponderance of evidence that the District failed to develop IEPs that included appropriate accommodations, modifications, supports, and services. (AR at 779.) Instead, the ALJ found that "the record reflected consistent and frequent evaluation of [E.M.'s] academic and behavioral needs, with earnest and thoughtful adjustment to [his] IEP and [BIP]." (*Id.* at 779-80; *see also id.* at 781 ("[E.M.'s] IEPs were based upon comprehensive appropriate assessments, were reasonably calculated to provide educational benefit to [E.M.] and offered [E.M.] appropriate

accommodations, modifications, supports, and services to enable [E.M.] to make progress appropriate in light of his circumstances.").)

In support of his decision, the ALJ made the following findings of fact that E.M. does not directly challenge: (1) from September 2016 to May 2017, the District conducted seven assessments, including a full triennial psycho-educational assessment, a second functional behavior analysis, and two ERMHS assessments; (2) the District convened 11 IEP team meetings; (3) E.M.'s Parents participated in each meeting, making suggestions, asking for additional or revised goals, reporting their view of [E.M.'s] then-current behaviors, and expressing concerns regarding his academic growth; (4) E.M. was assessed in all areas of suspected disability and his parents did not challenge the assessments; (5) the testimony and IEP team meeting notes indicate that the District regularly evaluated and assessed [E.M.'s] performance, behavior, and educational and emotional needs; (6) the District used multiple sources to determine his present levels of performance, drafted and revised goals, reviewed and updated accommodations and modifications, gathered behavior data, and fine-tuned the BIP; and (7) the District informed and involved E.M.'s Parents and waited for their approval to implement a goal or service. (*Id*. at 779-80.) E.M. bears the burden of demonstrating that the ALJ's decision regarding the IEP and BIP should be reversed. For the below reasons, E.M. does not meet his burden.

### a. The Psychologists' Recommendations

E.M. first argues the District denied him a FAPE because it "ignored" and "without explanation" adopted "none" of the recommendations from its own psychologists to modify his BIP. (Doc. No. 26 at 17, 20 n.13, 23.) E.M. also argues the District failed to adopt the "most important" recommendation, which was to develop a hierarchy of reinforcers and limit his access to a video game called Minecraft that E.M. was allowed to play on an iPad while in school. (*Id*. at 23.) The District contends it implemented "many" of the recommendations, though some were worded differently. (Doc. No. 29 at 9.) Based on the record, E.M. is incorrect that the District, without explanation, ignored the recommendations from its psychologists and failed to adopt any of them into E.M.'s BIP.

On October 24, 2017, Ms. Cummings issued an ERMHS assessment listing nine recommendations.[12] (AR at 408-09.) On October 25, 2017, Ms. Klock issued a report listing four recommendations.[13] (*Id.* at 675.) Ms. Cummings' assessment also included a recommendation relating to E.M.'s access to Minecraft. (*Id.* at 407.) On March 16, 2018, a third school psychologist, Ms. Valencia, issued an assessment also making a recommendation relating to E.M.'s use of video games. (*Id.* at 700, 702.)

---

[12] Ms. Cummings' recommendations were as follows:

(1) [E.M.] is minimally responsive to verbal praise; verbal praise should be specific in nature. (2) Use of structured choice when requesting alternative assignment to gain compliance. (3) Revising his Behavior Intervention Plan to include access to lower level reinforcement when he does not demonstrate expected behaviors/termination of tasks. (4) Continuing DIS Counseling to promote adaptive coping, prosocial behavior. (5) Continued [occupational therapy] support for behavioral regulation and teaching [E.M.] to employ coping strategies when he experiences thoughts of frustration. Consider trialing number scale rather than zones to honor [E.M.'s] preference and increase buy-in. (6) Adopt pragmatic goals to provide explicit, guided instruction and practice of deficit areas. (7) Enroll [E.M.] in a social skills/Circle of Friends group where he can practice learned strategies to assist with generalizing outside of DIS sessions. (8) Provide opportunities for [E.M.] to socialize with peers who have similar interests in order to increase opportunities for social/emotional learning. (9) Increase home to school communication to ensure consistent expectations for behavior and academic effort across environments.

(AR at 408-09.)

[13] Ms. Klock's recommendations were as follows:

(1) Outline behavioral expectations for upcoming situations. (2) Talk to [E.M.] when in a relaxed mood to help the student get to know his impulsive times, how it affects himself and others, and what alternative behaviors he could consider. (3) Encourage [E.M.] to observe his environment to notice if he sees/hears impulsive behaviors. Talk about what the individual could have done differently. Discuss the situation and alternatives. (4) Use of a daily schedule which provides [E.M.] with choices he can make throughout his day, and avoid power struggles[.]

(AR at 675.)

E.M.'s December 2017 BIP lists over a dozen "changes, structures, and supports" designed to "remove [E.M.'s] need to utilize problem behavior." (*Id.* at 628.) Those items incorporate several of the Districts' psychologists' recommendations. First, the BIP's instruction to provide a "[d]aily schedule that incorporates choices into [E.M.'s] day" and for "staff to avoid power struggles" adopts the recommendation for the "[u]se of a daily schedule which provides [E.M.] with choices he can make throughout his day, and avoid power struggles with [E.M.]." (*Id.* at 675.) Second, the BIP's instruction that "[a]cademic work [be] available that is geared to [E.M.'s] academic level" is consistent with the recommendation to "[a]dopt pragmatic goals to provide explicit, guided instruction and practice of deficit areas." (*Id.* at 408.) Third, the BIP's instruction to provide "alternate work activities" is consistent with the recommendation for the "[u]se of structured choice when requesting alternative assignment to gain compliance," (*id.* at 408), and "provid[ing] [E.M.] with choices he can make throughout his day," (*id.* at 675). Fourth, the BIP's instruction that "[s]taff should minimize reactions to problem behavior" appears to be consistent with the recommendation for "access to lower level reinforcement when he does not demonstrate expected behaviors/termination of tasks," (*id.* at 408), and "[t]alk[ing] to [E.M.] when in a relaxed mood to help the student get to know his impulsive times, how it affects himself and others, and what alternative behaviors he could consider," (*id.* at 675).

While the BIP does not expressly adopt many, if not most, of the psychologists' recommendations (or at least, did not adopt them verbatim),[14] the BIP includes multiple

---

[14] The items included in the BIP that were not expressly recommended by the psychologists include: (1) providing an available alternate work environment that is quiet and has less distractions; (2) positive relationship/rapport building with staff; (3) administering correctives in a manner that demonstrates that you are on E.M.'s side; (4) scheduled movement breaks; (5) making sensory tools available in classroom environment; (6) using positive reinforcement for general positive and on task behaviors; and (7) E.M. should receive far more attention for his appropriate/safe behavior and any on-task or academic related behavior and activity than he does for any problem behavior. (AR at 628.)

additional items that were not expressly recommended by the psychologists.[15]  The BIP also outlines detailed "replacement behaviors," "reinforcement procedures," and "response[s] to problem behavior[s]." (*Id.* 629-31.)  Moreover, the record does not show that any of the items in the BIP were inconsistent with the psychologists' recommendations.  For example, the BIP's inclusion of administering "correctives" in a manner that demonstrates "siding with E.M.," (*id.* at 628), is consistent with the recommendation to "avoid power struggles" with E.M., (*id.* at 675).

Overall, recommendations are, by definition, not compulsory.  The District's employment of professionals willing to critically evaluate the special educational needs of children and suggest specific solutions is a practice that should not be discouraged.  The District, acting through the IEP team, was ultimately responsible for deciding whether to adopt the recommendations of its own employees.  Indeed, the District does not cite any authority, and the court is aware of none, that requires the District to do so.  Based on the above, the preponderance of evidence shows that the District did not deny E.M. a FAPE by failing to adopt, verbatim, most of the recommendations from its psychologists into E.M.'s BIP.

///

///

---

[15] The recommendations that were not expressly adopted include: (1) continuing DIS counseling to promote adaptive coping, prosocial behavior; (2) continuing [occupational therapy] support for behavioral regulation and teaching [E.M.] to employ coping strategies when he experiences thoughts of frustration; (3) enrolling [E.M.] in a social skills/Circle of Friends group where he can practice learned strategies to assist with generalizing outside of DIS sessions; (4) providing opportunities for [E.M.] to socialize with peers who have similar interests in order to increase opportunities for social/emotional learning; (5) increasing home to school communication to ensure consistent expectations for behavior and academic effort across environments; (6) outlining behavioral expectations for upcoming situations; (7) encouraging [E.M.] to observe his environment to notice if he sees/hears impulsive behaviors; and (8) limiting access to Minecraft.  (AR at 407-09, 675.)

### b.     Minecraft and Hierarchy of Reinforcers

E.M. argues that he was denied a FAPE because his December 2017 BIP was not modified to include limiting his access to Minecraft and developing a hierarchy of reinforcers.  (Doc. No. 26 at 23.)  In support of his argument, E.M. claims that: (1) Ms. Cummings and Ms. Valencia recommended that the team develop a hierarchy of reinforcers in lieu of Minecraft; (2) Ms. Romero continued to give E.M. access to Minecraft; (3) the IEP team failed to develop a hierarchy of reinforcers; (4) the District's list of reinforcers in the December 2017 BIP are nearly identical to those listed in the September 2016 BIP; (5) the only reinforcer used in December 2017 and afterwards was Minecraft; and (6) the list of reinforcers in the December 2017 BIP is not a hierarchy because the list does not explain which reinforcers are more preferable for E.M. and/or which should be offered to him before others.  (*Id.*)

Contrary to E.M.'s suggestion, neither Ms. Cummings' nor Ms. Valencia's written assessment recommended a "hierarchy of reinforcers in lieu of Minecraft."  In her October 2017 assessment, Ms. Cummings recommended that "task and reward contingencies need to involve less preferred items/activities (i.e. not Minecraft).  Given a new task demand, should [E.M.] demonstrate the expected behavior criteria[,] he can be given contingent access to the iPad."  (AR at 407.)  On December 14, 2017, the parties met to "review assessment results . . . . and discuss recommendations."  (*Id.* at 408, 628-31.)  A BIP was developed that specifically included "iPad" and "Minecraft" among a list of "current reinforcements."[16]  (*Id.* at 630.)  The reference to a "hierarchy" of preferred activities

---

[16] The ALJ's written decision focuses heavily on Ms. Cummings' recommendation regarding E.M.'s access to Minecraft because the ALJ found, with respect to the appropriateness of E.M.'s IEP and BIP, the failure to limit Minecraft was E.M.'s "primary" argument and was continually referenced by E.M. at the hearing.  (AR at 780.)  In his brief, E.M. does not address any of the specific recommendations from the psychologists other than Ms. Cummings' recommendation regarding Minecraft.  (Doc. No. 26 at 23.)

appears to be taken from the notes of an October 25, 2017 IEP meeting stating "[a] hierarchy of preferred activities for reinforcement was recommended to be put into place." (*Id.* at 642.) The meeting notes do not indicate who made the recommendation, but Ms. Cummings subsequently testified that she recommended, at some point, that the IEP team "consider adapting somewhat of a hierarchy of support." (*Id.* at 1093.)

Furthermore, Ms. Romero's decision to allow E.M. continued access to Minecraft does not necessarily conflict with his IEP or BIP because it was never decided, or even recommended, that access be completely eliminated. The ALJ rejected E.M.'s claim that Ms. Cummings found that E.M.'s access to Minecraft should be "eliminated." (*Id.* at 780.) In his motion, E.M. does not dispute the ALJ's finding that Ms. Cummings did not recommend eliminating Minecraft. (Doc. No. 26 at 23.) Instead, E.M. acknowledges that the recommendation was to "limit" access to the game. (*Id.*)

The record also does not support E.M.'s contention that Minecraft was the "only" reinforcement the IEP team was using in December 2017 and afterwards. As the ALJ correctly found:

> The December 2017 [BIP] included multiple reinforcement strategies that did not include the iPad, such as choice in work environment, asking for breaks, token economy, hot chocolate, extra recess time, and being a helper to a preferred adult. The success of each strategy varied. Student's assertion that Poway ignored its own psychologist's recommendations was unsupported by the evidence.

(AR at 780.) Additionally, there is nothing in the record to suggest, and E.M. does not allege, that E.M.'s Parents were unaware of the inclusion of these provisions or were prevented from objecting to their inclusion. The December 2017 meeting notes state the BIP and IEP meeting notes were reviewed by E.M.'s Parents. (*Id.* at 676-77.) Similarly, the record does not show that E.M.'s Parents sought to have all the recommendations adopted. In April of 2018, Ms. Valencia issued her report recommending that "[t]he video games should be limited for [E.M.]." (*Id.* at 702.) On May 3, 2018, the parties met and discussed, *inter alia*, "possible solutions for game time." (*Id.* at 707.) The record of the

meeting states "suggestions were less time at home or school as well as different activities on the iPad or implementing screen time on computers and Chrome book." (*Id.*) The record does not state that the parties agreed on any particular suggestion regarding Minecraft. Moreover, Ms. Romero subsequently testified that prior to Ms. Valencia's April 2018 report:

> [W]e had tried removing iPad as a reinforcer. And the levels of behavior went very high, and the work demand went very low. We have definitely tried introducing and trialing noncomputer-based reinforcers. And it just was not successful. And it led to more behavior and less work production. . . . [W]e did try [a computer-based reinforcer other than Minecraft]. . . . The computer games that – or the computer access that's on a school campus was not interesting for E.M. He tried it a couple of times. And eventually it turned into the same thing of I don't want to work with a computer – don't – I'm not interested in that. . . . I do recall [Ms. Valencia's rationale for limiting the video games for E.M.]. And we had a discussion that when he did not have any computer or iPad access in previous instances for periods of weeks at a time, we did not see any new behavior. We did not see – and, if anything, it was the opposite. If he didn't have access to it, we saw worse behavior because he had no reinforcement that he was interested in. So in my experience with E.M., the data did not show that he had any more aggression or anything when we – he had access to it then when he didn't. He – there were times where he did not have access to a computer or an iPad, and the behavior was higher.

(*Id.* at 1406-07.) Based on the above, there was no concrete recommendation that access to Minecraft be eliminated or that a hierarchy of reinforcers be developed. The preponderance of evidence does not show that the District denied E.M. a FAPE by failing to adjust E.M.'s BIP or EIP with respect to reinforcers. Similarly, the record does not suggest, and E.M. does not allege, that the District failed to comply with the BIP by allowing him continued access to Minecraft as a reinforcer or that E.M.'s Parents were prevented from participating in any decision regarding his access to Minecraft or any other reinforcer.

///

///

## 2. Least Restrictive Environment

The IDEA statute requires that children with disabilities be educated "to the maximum extent appropriate" with children who are not disabled. 20 U.S.C. § 1412 (a)(5)(A). School districts must ensure that "special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." *Id*. This is referred to as IDEA's "mainstreaming" or "least restrictive environment" requirement. *Smith v. Los Angeles Unified Sch. Dist.*, 830 F.3d 843, 847 (9th Cir. 2016); *Sacramento City Unified Sch. Dist. v. Rachel H.*, 14 F.3d 1398, 1403 (9th Cir. 1994).

Because the court affirms the ALJ's finding that the District committed a procedural violation that amounted to a denial of a FAPE, *see supra*, IV(A)(1), the court declines to reach the substantive issue of whether private school placement constitutes a FAPE in E.M.'s least restrictive environment. "[T]he court need not reach the question of substantive compliance if the court finds procedural inadequacies that . . . . seriously infringe the parents' opportunity to participate in the IEP formulation process[.]" *Hellgate*, 541 F.3d at 1207 (citation and internal quotation marks omitted); *see also M.M. v. Lafayette Sch. Dist.*, 767 F.3d 842, 856 (9th Cir. 2014), *as amended* (Oct. 1, 2014) (declining to reach the issue of substantive compliance after finding a procedural violation that denied a FAPE); *Amanda J.*, 267 F.3d at 895 (declining to reach the issue of substantive compliance after finding that the district denied a FAPE by failing to provide a specific offer of placement); *Grossmont*, 2019 WL 4849172, at *5 ("In other words, if procedural inadequacies are such as to amount to the denial of FAPE, the court need not reach the issue of substantive compliance[.]"); *Popowitz*, 2011 WL 12697384, at *26 (declining to reach substantive issue after finding the school district failed to make a specific placement offer).

The court recognizes, however, that all parties and participants involved in this case devoted a great deal of time and effort to determine the most appropriate and least

19cv689 MJ MSB

restrictive educational environment for E.M. As recognized by the ALJ, the District has conducted repeated and lengthy assessments of E.M.'s needs and the parties have met at least a dozen times to discuss and adjust E.M.'s IEP. (AR at 780.) Additionally, the parties and their counsel presented evidence to the ALJ over the course of a multi-day hearing. (*Id*. at 741.) Furthermore, in his lengthy and carefully considered written decision, the ALJ devotes a considerable portion of his analysis to evaluating whether E.M.'s current placement constituted a FAPE in the least restrictive environment. (*See id*. at 741-86.) The parties' too, in their papers, devote considerable analysis to the issue. (*See* Doc. Nos. 26, 27, 29, 30.) Ultimately, however, the ALJ found that private school was E.M.'s least restrictive environment without knowing, or at least explaining on the record, what that environment included. Without having any specific details about the services and programs that were included in the District's offer to place E.M. in private school, the ALJ nonetheless found that private school was more appropriate and less restrictive than E.M.'s current placement. While the ALJ likely has far greater expertise than the court as to the programs and services generally available in private schools, which might be far more conducive to meet the challenges posed by E.M. and chronicled in the factual background of the order, without knowing the specific services and programs that were being offered to E.M., the court cannot determine that placement in a private school would be more appropriate than E.M.'s current one. As stated in E.M.'s motion, "a placement offer cannot be both a denial of FAPE and appropriate." (Doc. No. 33 at 2.) While both parties may have desired that the court decide the appropriate placement for E.M., without a specific placement offer to evaluate, the court cannot reasonably do so.[17]

_____

[17] Although the court has referred to the ALJ's decision as "carefully considered," for the reasons stated, the court does not afford the ALJ's findings "particular" deference. *See Napa Valley*, 496 F.3d at 937. Based on a thorough review of the record and the ALJ's decision, no part of the court's order depends on affording "particular" deference above and beyond what the court has, in its discretion, already afforded.

## V.    CONCLUSION

For the above reasons, the court: (1) affirms the ALJ's decision that the District failed to make a sufficiently specific placement offer; (2) declines to reach the issue of whether private school is E.M.'s least restrictive environment; (3) affirms the ALJ's decision that E.M.s' individualized education program (IEP) was reasonably calculated to enable E.M. to make appropriate progress; and (4) affirms the ALJ's decision that the District did not unreasonably delay initiating a due process hearing.  Both parties' motions are, therefore, **GRANTED IN PART** and **DENIED IN PART**.  Although E.M. requests an order declaring him the prevailing party, (Doc. No. 26 at 31), the court declines to determine whether E.M. is the prevailing party unless and until a motion for attorney's fees is filed.  The Clerk of the Court shall terminate the case.

IT IS SO ORDERED.

DATED: January 14, 2020

JEFFREY T. MILLER
United States District Judge

19cv689 MJ MSB